UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
DOCKET NO. 5:17-cv-00176

| | | |
|---|---|---|
| **SWIFT BEEF COMPANY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | AMENDED ORDER |
| | ) | |
| **ALEX LEE, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the court on plaintiff's Emergency Motion for a Temporary Restraining Order (#3), which converted to a motion for preliminary injunction, and defendant's associated Motion to Alter or Amend Judgment (#16). After considering the motions and reviewing the pleadings, the court enters the following Amended Order.[1]

## I.    Background

Plaintiff Swift Beef Company is a meat company that offers a range of brands and programs designed to meet the needs of purchasers. One such program is known as "Case Ready," which provides fresh meat cut and packaged to customer specifications and made ready for placement in coolers or freezers, such as at local grocery stores. Plaintiff offers beef, pork, and poultry options in its Case Ready business line. (Emergency Motion for TRO, #4 at 3-4). Defendant Alex Lee, Inc., is a privately held company with two primary food distribution and retail operating companies: Merchants Distributors, Inc. and Lowes Foods, LLC. They service customers in North and South Carolina, Virginia, West Virginia, Georgia, Alabama, Florida, Tennessee, Ohio,

---

[1]    The Court commends defendant for bringing the error to its attention.

Pennsylvania, and Kentucky. Defendant owns a plant in Lenoir, North Carolina, which is used as a meat processing and packaging facility that defendant leases out to operators. On April 21, 2014, defendant and plaintiff entered into a Lease Agreement and a Purchase Agreement ("the Agreements"). The Agreements had defendant lease the Lenoir plant to plaintiff, and required plaintiff to supply defendant with certain Case Ready products. The Agreements have a ten year term and are linked; if a party fails to perform under one, both may be terminated. (#4 at 4-8).

Plaintiff contends that a material breach of the Agreements is imminent, arguing that defendant is attempting to evict plaintiff from the Lenoir plant without cause. (#4 at 10-11). In doing so, plaintiff claims irreparable harm will result in the form of loss of goodwill, sales, customers, and business opportunities, as well as denial of property rights. (#4 at 18). Defendant argues that they are not attempting to evict plaintiff, but if they did, they would be within their rights given certain alleged breaches in performance by plaintiff. (Defendant's Response, #13 at 7-8). Further, defendant notes that an eviction is impossible without commencing summary ejectment proceedings in state court, and suggests that a preliminary injunction is unwarranted given defendant's ability to make their case in ejectment proceedings instead. (#13 at 5-6).

## II.     Legal Standard

Whether to grant injunctive relief is within the sound discretion of the district court. See Hughes Network Sys. V. InterDigital Commc'ns Corp., 17 F.3d 691, 693 (4th Cir. 1994). However, granting a preliminary injunction "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. The danger of a mistake in this setting is substantial." Scotts Co. v. United Indus. Corp., 315 F.3d 264, 284 (4th Cir. 2002) (citations and internal quotations omitted). Consequently, a preliminary injunction is "an extraordinary remedy

. . . which is to be applied 'only in [the] limited circumstances' which clearly demand it." <u>Direx Israel, Ltd. V. Breakthrough Med. Corp.</u>, 952 F.2d 802, 811 (4th Cir. 1992) (quoting <u>Instant Air Freight Co. v. C.F. Air Freight, Inc.</u>, 882 F.2d 797, 800 (3rd Cir. 1989)). The injunction must "be tailored to restrain no more than what is reasonably required to accomplish its ends." <u>Consolidation Coal Co. v. Disabled Miners of S.W. Va.</u>, 442 F.2d 1261, 1267 (4th Cir. 1971).

A party seeking a preliminary injunction must establish (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. <u>See Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7 (2008). While a balancing test was previously used, today every preliminary injunction factor must be "satisfied as articulated" and courts "must separately consider each *Winter* factor." <u>Pashby v. Delia</u>, 709 F.3d 307, 320 (4th Cir. 2013) (citing <u>The Real Truth About Obama, Inc. v. FEC</u>, 575 F.3d 342, 347 (4th Cir. 2009)). The Court will, therefore, deem defendant's Motion to Alter or Amend Judgment a Motion for Reconsideration (inasmuch as defendant seeks reconsideration of an Order rather than a Judgment) and grant that motion. In considering the <u>Winter</u> elements, the Court will consider each factor separately and delve into why each factor has been satisfied as articulated, particularly the element requiring plaintiff to show that it is likely to succeed on the merits.

## III.    Discussion

### A.    Likelihood of Success on the Merits

First, the court considers the likelihood of plaintiff's success on the merits. Plaintiff must make a "clear showing" they are likely to succeed at trial. <u>Real Truth</u>, 575 F.3d at 345. However,

plaintiff "need not show a certainty of success." Pashby, 709 F.3d at 321 (citing 11A Charles Alan Wright et al., Federal Practice & Procedure § 2948.3 (2d ed. 1995)). Furthermore, "the possibility of irreparable harm does not constitute a 'clear showing' that the plaintiff is entitled to relief." Di Biase v. SPX Corp., 2017 U.S. App. LEXIS 18757, *21 (4th Cir. Sept. 28, 2017). When plaintiff has produced undisputed evidence on the issue at hand, they have established a clear showing that they are likely to succeed at trial. See League of Women Voters of N. Carolina v. North Carolina, 769 F.3d 224, 246 (4th Cir. 2014).

In conducting this inquiry, the Court first considers the nature of the substantive claim asserted by plaintiff in its Complaint. Here, plaintiff contends that defendant, in threatening to prematurely terminate the lease, is anticipatorily breaching the contract that exists between the parties. Under North Carolina law, "the elements of a breach of contract claim are (1) existence of a valid contract and (2) breach of the terms of that contract." Wooton v. CL, LLC, No. 2:09–CV–34–FL, 2010 WL 3767308, at *5 (E.D.N.C. 2010) (citing Lake Mary Ltd. P'ship v. Johnston, 145 N.C. App. 525, 536 (2001)). Similarly, the elements of a valid contract are "mutual assent, legal capacity, consideration, and a legal bargain." Orthodontic Ctrs. of Am., Inc. v. Hanachi, 151 N.C. App. 133, 135 (2002). It does not appear that either party challenges the validity of the underlying contract; thus, the issue is whether plaintiff will likely show by a preponderance of the evidence that defendant has anticipatorily breached that agreement.

"Breach of contract occurs when a party fails to perform a contractual duty which has become absolute." Millis Constr. Co. v. Fairfield Sapphire Valley, 86 N.C.App. 506, 510 (1987). In contrast, an anticipatory breach occurs when "[a] breach is committed before there is a present duty of performance, and is the outcome of words evincing intention to refuse performance in the

future." Cook v. Lawson, 3 N.C.App. 104, 107 (1968) (citation omitted) (internal quotations omitted). In considering whether plaintiff has made a clear showing, the Court has closely reviewed both the allegations of anticipatory breach and the proffer of evidence plaintiff contends supports such assertions under the applicable standard, highlighted by the defense's instant motion seeking reconsideration.

Plaintiff has presented evidence that defendant, through communications by its president and then its counsel, has threatened to terminate the lease. That evidence tends to show that on July 3, 2017, defendant's President and CEO, Brian George, issued an email to Swift stating that "it will be best for our respective companies to end the case ready plant relationship by terminating the lease." Bode Decl. at ¶ 20 (Plaintiff's Exhibit "A"). Mr. George did not, however, preface that assertion with any claim that plaintiff had defaulted under the Agreements in any manner. Id. Plaintiff's evidence then shows that four days later, it offered to buy the plant from defendant for $30 million, id. at ¶ 21, which was met with an "Offer Notice" from defendant to sell the plant for $50 million. Offer Notice (#1-5 at 2). According to plaintiff, defendant mistakenly characterized plaintiff's "Right of First Refusal" under Section 31 of the Agreement as a "Right of First Offer" in that communication, which also conveyed the defendant's belief that plaintiff was in breach of the agreement. Like the July 3 email, the second communication did not describe the details of the alleged breach. Id.

On July 26, plaintiff declined the defendant's offer to sell the plant for $50 million and inquired concerning the details of the alleged breach. Bode Decl. at ¶23; Swifts Response to Offer (#1-6 at 2). Nearly a month passed before defendant responded through outside counsel. Alex Lee Letter (#1-7). In that August 23, 2017 letter, defendant, through counsel, asserts that plaintiff

has failed "to follow this pricing formula and to use commercially reasonable efforts to produce the Product efficiently and at a competitive cost." Id. at 3. The letter then generally describes or lists shortcomings of plaintiff in its performance, but plaintiff contends that such letter does not provide the notice required under the lease agreement. Plaintiff further contends that such letter mistakenly characterized its "Right of First Refusal" under the agreement as a "Right of First Offer." Plaintiff also points out that such letter fails to provide details as to plaintiff's failings or when those events occurred. Further, plaintiff appears to assert that the letter overlooks defendant's obligation under Section 18.2 of the agreement to provide it with written notice of the deficiencies, describe when it provided plaintiff with such written notice, or assert that plaintiff was unable to cure noticed deficiencies within the contractual 30 day period.

The proffer further shows that counsel for defendant sent an email on September 6, 2017, stating that if plaintiff did not buy the plant for $50 million, defendant will "terminate the lease immediately" and "commence eviction proceedings" in order to eject plaintiff from the Lenoir Property. Id. at ¶ 27; Klinghorn Email (#1-9 at 2-3). Plaintiff responded to this correspondence on September 12, 2017, refuting the defendant's arguments and pointing out that they were based on a misinterpretation of the agreements. Bode Decl. at ¶28; Swift Response (#1-10 at 3-6). Important for the present purposes, plaintiff demanded that defendant retract its threat of termination of the lease (contained in the September 6 email) by 5 p.m. on September 14, 2017. Swift Response (#1-10 at 5). No retraction was ever offered despite later discussions between the parties and counsel, and this action followed.

While defendant has presented evidence that casts serious doubt on whether plaintiff has fully upheld their obligations under the terms of the agreement, to wit, that plaintiff may have

failed to use commercially reasonable efforts to produce Case Ready goods efficiently and at competitive prices, that is not relevant to the issue of whether defendant has anticipatorily breached the agreement. As discussed above, an anticipatory breach of contract differs materially from a breach of contract as an anticipatory breach "is committed before there is a present duty of performance, and is the outcome of words evincing intention to refuse performance in the future." Cook, supra. Even if the court accepts defendant's version of events entirely, to wit, that plaintiff's performance has been deficient, plaintiff has been able to present compelling evidence that defendant's threat to terminate the lease for that deficient performance was never preceded by written notice under Section 18.2 of the Lease Agreement. That provision triggers a right to cure the deficiency within 30 days:

> **_18.2._**   In the event of a Tenant Event of Default, Landlord, at its option, may, unless the Tenant Event of Default is cured within thirty (30) days after written notice of the Tenant Event of Default is delivered to Tenant, immediately terminate this Lease and all of the rights of occupancy of Tenant under this Lease, and then Landlord shall have the right to enter the Property and remove all persons and property from the Property.

Lease Agreement (#1-1 at 11 (page 10 of agreement)). At this point, the evidence is undisputed that plaintiff did not receive contractual notice of the deficiencies – and the opportunity to cure – that could trigger a default under Section 18.2. Thus, the Court concludes that plaintiff has made a "clear showing" they are likely to succeed at trial on the claim of anticipatory breach of contract. On the other side of the coin, if defendant were to assert a counterclaim for breach of contract, it does not appear that it would likely succeed on that same claim as it could not show a breach absent a showing of compliance with Section 18.2. As the Court stated in its earlier Order, it could not say that plaintiff _will_ succeed on its claim of anticipatory breach of contract, but can say with certainty that it is likely to succeed inasmuch as a threat to immediately terminate the lease would

likely be found to be a breach of the agreement where it was not prefaced with both notice and an opportunity to cure as provided in the agreement. This element is satisfied as articulated.

### B. Irreparable Harm

Next, the court will consider the likelihood of irreparable harm to plaintiff if the injunction is denied. If plaintiff is evicted from the plant in Lenoir, plaintiff argues they will suffer irreparable harm through loss of goodwill, sales, customers, and business opportunities. Further, they will lose their property rights under the Agreements, as six and a half years remain before they expire. (#4 at 18). However, defendant asserts that such talk is premature, given that defendant has yet to terminate the Agreements or commence any eviction proceedings. (#13 at 5). Additionally, defendant notes that they must obtain a writ of possession through proceedings in state court before plaintiff could be evicted. Since plaintiff would have a full and fair opportunity to be heard on the merits there, defendant argues that any harm is not irreparable.

Here, the court finds that plaintiff has properly showed irreparable harm if it were wrongfully evicted. Plaintiff has proffered that it would lose both goodwill and customers if defendant goes through with its threat to terminate the lease and evict it from the leasehold, which is considered "unique" as a matter of law. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied."); Pelfresne v. Village of Williams Bay, 865 F.2d 877, 883 (7th Cir. 1989) ("As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute."). Further, the Court finds defendant's responsive

argument is insufficient to defeat plaintiff's showing of irreparable harm, as the availability of eviction proceedings in state court does not preclude plaintiff from pursuing an injunction. <u>See Fairfield Resorts, Inc. v. Fairfield Mountains Prop. Owners Ass'n, Inc.</u>, 2006 WL 1889152, at *5 (W.D.N.C. 2006) ("It is true that there is a proper way for Defendant to undertake removing Plaintiff from the leased properties. However . . . [i]f it were enough to merely show that a particular legal means to perform some action existed, few, if any, preliminary injunctions would ever issue."). As discussed above, an eviction proceeding is ancillary to a breach of the lease agreement. From the evidence now before the Court, it appears unlikely that defendant will be able to allege a breach absent being able to show that it first complied with Section 18.2 of the lease agreement.[2] Thus, the proper legal vehicle to determine the rights of these parties is an action in contract, not summary ejectment, and this Court has jurisdiction over that action under its diversity jurisdiction.

Plaintiff has, therefore, satisfied its burden of showing that it would likely suffer irreparable harm to its goodwill, its ability to service to customers, and harm its unique leasehold interest in real property in Caldwell County if the injunction were not to issue. This element is satisfied as articulated.

### C.    Balance of Equities

Next, the court considers whether the balance of the equities tips in favor of plaintiff. Defendant claims that entry of a preliminary injunction would deny defendant access to judicial processes through which the dispute should be resolved. Further, defendant argues that plaintiff is

---

[2]    If it has not done so already, defendant may well be able to assert a counterclaim for breach of contract if it can show that it provided the required notice and opportunity to cure before this litigation commenced or does so during the course of this litigation.

committing ongoing breaches to the Agreements that are causing serious harm to defendant, and that an injunction would prevent defendant from exercising its rights under the Agreements to remove plaintiff and thus eliminate the harm. (#13 at 10). In response, Plaintiff suggests that maintaining the *status quo* presents no harm to defendant, since all the injunction would do is prevent defendant from committing a breach of the Agreements by immediately terminating them and evicting plaintiff. (#4 at 22).

Here, the court finds that the projected harm to defendant is minimal. While it is true that a preliminary injunction would prevent defendant from pursuing eviction proceedings elsewhere, they are still free to make their case before this court, to wit, that plaintiff is in breach of the Agreements, as the matter proceeds. If defendant can successfully prosecute a counterclaim for breach of the lease agreement, it will then be free to take this Court's Judgment to the North Carolina General Court of Justice and pursue its summary ejectment proceeding. In any event, defendant is not put to any additional burden because it will have to prove breach in any event.

Having balanced these substantial interests on both sides, the court does not find that the harm to defendant by issuing a preliminary injunction is irreparable and it places little additional legal burden on defendant. Any harm done, which defendant apparently believes is a loss of profits due to plaintiff's alleged underperformance in providing Case Ready Goods, can be remedied if that becomes necessary. On the other side of the balance is plaintiff's ability to do business and operate from a place of business free from threats by its landlord that it is prepared to seek summary ejectment, apparently without cause under the lease agreement. As discussed above, that leasehold interest as a place of business is given special protection under North Carolina law. If defendant had been able to show its full compliance with Section 18.2 of the lease agreement, the equitable

balance would have shifted and this Court simply would not have imposed the TRO.  What is plainly before the Court is a situation where the landlord has threatened to dispossess the tenant from its leasehold, as to which plaintiff has shown would be without cause under the lease agreement. While a landlord has available a summary ejectment proceeding, a tenant lacks recourse to preserve the tenancy except through injunctive relief.  Given minimal irreparable harm to defendant if a preliminary injunction issues and various irreparable harms to plaintiff if their motion is denied, the court finds that the balance of the hardships tilts decisively in plaintiff's favor. This is element is, therefore, satisfied as articulated.

### D.    Public Interest

Finally, the court considers the public interest. The court finds that the public has a strong interest in enforcing and protecting valid contracts. See Campbell Alliance Group, Inc., 2014 WL 51241, at *4 (citing ISCO Indus., LLC v. Erdle, No. 5:11-CV-552-F, 2011 WL5101599, at *4 (E.D.N.C. 2011) ("[T]he public interest is served by granting this temporary restraining order because such issuance ensures that valid contracts are enforced.").  If plaintiff is in breach of the lease agreement, the public interest would lie with plaintiff being removed from the property.  If defendant has anticipatorily breached the lease agreement by threatening eviction before providing plaintiff with notice and opportunity to cure, then the public interest is in tenant maintaining the leasehold free from threat so that it may attend to the cure.

As described above, plaintiff has presented undisputed evidence that defendant has not fulfilled the condition precedent of providing written notice and an opportunity to cure, as provided by Section 18.2 of the Lease Agreement. As in Campbell Alliance, the public interest is served by ensuring that valid contracts, including lease agreements, are enforced.  Finally, the Court notes

that the threatened termination of the Agreements and eviction from the Lenoir plant would disrupt plaintiff's ability to provide food for distribution not just by defendants, but by other food distributors as provided in the agreement, who in turn serve the public. (#4 at 20). Thus, the "public's interest in an abundant food supply" is also important in considering where the public interest lies. State ex rel. Missouri Dep't of Agric. v. McHenry, 687 S.W.2d 178, 182 (Mo. 1985). Thus, the Court finds the public interest weighs in favor of the plaintiff, as it is preferable to "preserv[e] the *status quo* pending a determination of the parties' respective rights." Fairfield Resorts, 2006 WL 1889152 at *6. This is element is, therefore, satisfied as articulated.

### E.    Conclusion

Having reviewed the evidence in light of the Winter standard, the court finds that issuance of a preliminary injunction is appropriate as each element has been satisfied as articulated.

***

It is also readily apparent to the Court that it has been drawn into a dance between two very sophisticated and successful business entities in their negotiations over the price to be paid for a processing plant in Caldwell County: plaintiff wants to pay $30 million and defendant wants to sell for $50 million.  That issue can be resolved by the parties and the Court would commend participation in early mediation facilitated by an experienced business mediator and perhaps an appraiser.  To that end -- and only if the parties agree and file a joint motion -- the Court would consider a stay of these proceedings for a definite period while amicable resolution is pursued.

## ORDER

**IT IS, THEREFORE, ORDERED** that defendant's Motion to Alter or Amend Judgment (#16), deemed to be a Motion to Reconsider the previous Order, is **GRANTED,** and, upon further consideration in light of <u>Winter</u>, plaintiff's Motion for Preliminary Injunction (#3) is **GRANTED**. Pending resolution of this matter on the merits or further Order of this court, defendant is enjoined from seeking removal or eviction of plaintiff, removing plaintiff's property or goods from the premises, or in any manner interfering with plaintiff's enjoyment of its leasehold under the Lease Agreement. Under Rule 65(c), no performance bond will be set at this time.

Signed: October 20, 2017

Max O. Cogburn Jr.
United States District Judge